*756 Fuchsberg, J.
(concurring). This is a very close case, both on the merits and in its litigation history. The Appellate Division’s order of reversal was accompanied by an unsigned memorandum to which one Judge filed a partial dissent and a second a full dissent. In our own divided court, the two dissenters support their views in a carefully molded opinion which critically analyzes the reasoning and authorities on which the majority at the Appellate Division acted. In this circumstance, instead of joining in the majority’s summary adoption of the memorandum below, I prefer to articulate the reasons for my vote.
At issue in this declaratory judgment action is plaintiff County of Broome’s entitlement to a defense and indemnification under a “premises and operations” policy of liability insurance issued by defendant The Travelers Indemnity Company.[1] The claim on which The Travelers disclaimed was one brought against the county by the owner of an automobile which was damaged when it unauthorizedly was moved by a third party on an exhibition floor of the county’s Veteran’s Memorial Arena, where it had been placed for exhibit at the direction of licensees of the county who were sponsoring a one-day show. The pivotal point is whether, under the circumstances in this case, an exclusionary clause, under which property in the “care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control” relieved the carrier of responsibility. The sponsors of the show, in obtaining permission to use the arena for the occasion, had agreed, inter alia, to secure property damage insurance for the protection of the county. It presumably was in alleged fulfillment of this obligation that, naming the county as an additional insured, the sponsors purchased the policy which contained the clause in controversy.
The arrangement for the use of the arena was memorialized in a written rental agreement, which, in form required by the county, also provided that the show was to take place on the weekend day of January 6, 1980 and, in preparation for its opening, granted the sponsors access to *757 the premises on the previous day, January 5, when their displays could be brought in and set up by the sponsors and their fellow exhibitors. In addition to the rental fee per se, the agreement also called for payment of so-called “reimbursement expenses” by way of “all expenses for security in relation to the Licensee’s performance, and all usual expenses incurred by the Arena in connection with said performance”.
It was on the evening of January 5, after the automobile, which the show’s sponsors had obtained from a local dealer, had been brought in and located at the direction of the sponsors, that the car, whose keys had been left in its ignition by those who placed it there, was damaged. At the time, the only county employee on duty at the arena was its regular backdoor guard, who, attracted by a bright light on the exhibition floor, came upon the automobile and the fleeing individual who had crashed it; it is undisputed that the backdoor guard’s assignment was keyed to the arena as such rather than to the activities or wares of exhibitors, for he was kept on duty around the clock on weekends regardless of whether a show or other event was being carried on by others. Also not controverted is that, while other security guards whose duties went beyond the limited ones of a backdoor guard were engaged, these were only for those hours on January 6 during which the public was to be admitted to the show. It is noteworthy, therefore, that, at an examination before trial in the underlying action brought for the damage to the automobile, while the spokesperson for the licensee testified that she had asked the arena about security on the move-in day, when asked whether it was to be provided specifically for the items being exhibited, her answer in the end was a conclusory “I would have understood that to be so. Otherwise why would I need security?”
Essentially on this record, Special Term opined that the automobile, at the time it was damaged, was, within contemplation of the exclusionary clause, in the care and custody of the county. On cross motions, it thereupon granted summary judgment to the plaintiff. However, the Appellate Division, of the view that the county had no meaningful “right to exercise physical dominion over the *758 vehicle”, modified the order appealed from by granting summary judgment to the county instead. For the reasons which follow, I agree with the result it reached.
At the outset of my analysis, I recognize that an exclusion of coverage does not occupy a subordinate position in an insurance policy. For it is established that the protection afforded an insured is spelled out by the net balance which results from a calculation in which a policy’s insuring and exclusionary provisions are each entitled to full weight. Just as the former indicate what coverage is included, so, with equal force, the latter indicate what is not (Schiff Assoc. v Flack, 51 NY2d 692, 699).
Concomitantly, of course, when any ambiguity lurks in the language of an exclusion, as in all other parts of a contract of insurance, it is to be liberally construed in favor of the insured, and no less so if this benefits an unnamed rather than a named assured.
So examined, since the clause before us does not specify whether the “care, custody or control” of which it speaks is that of the arena and its contents as a whole or of each of its contents taken separately, the Appellate Division’s conclusion that its applicability was “dependent upon the insured’s rights and acts concerning the specific damaged property out of which the claim of liability arises” appears eminently correct. All the more is this so in the context of a policy designed, as this one was, to cover, among other things, “exhibitions”, comprised, as these most often are, of a miscellany of objects. I therefore focus on the county’s relationship to the automobile.
In that connection, one first must look to see not only whether, in the literal language of the exclusion, the county ever assumed physical “care, custody or control” of the car, but whether it did so “for any purpose”. Realistically reviewed, I cannot find that it did. Unlike the arena for whose use the sponsors of the show had contracted, at all relevant times the vehicle belonged to the automobile agency and the arrangements for its display at the arena were those made and carried out solely as agreed between the agency and the sponsors, and without the particular permission or participation of the county at all. Indeed, *759 before it arrived, the county had no knowledge that an automobile would be part of the exhibit. Moreover, the record indicates that the county played no part in controlling the time, the place or the movements of the car when it was brought to the arena on January 5 or, later that day, when, at the direction of the sponsors, and to facilitate their arrangement of other exhibits, it was relocated to the area where the trespass to it was to occur.
Most telling perhaps in determining whether “care, custody or control” of the exhibits was lodged in the county is the fact that the agreement, which, by the by, contained a merger clause, did not reserve to it any right to interfere with, much less veto, these or any other aspects of the supervision of any parts of the exhibit. Though, as “standard procedure” under a specific provision of the agreement, the rear guard’s wages, along with other arena “operating costs”, would be charged to licensees as additional financial emoluments by which the county was recompensed for turning over use of the premises to exhibitors, there is nothing to suggest that the rear guard’s duties in fact were enlarged to include specific property of the exhibitors.
For all practical purposes, therefore, the premises were nothing more than the locus for a private event. And, once the county had licensed the arena to the sponsors, by any commonsense definition of the phrase “care, custody and control” the exhibits were to continue in the hands of the sponsors and their exhibitors alone.[2]
Nevertheless, emphasizes the carrier, the county provided a guard. So it did. But the duties of the only guard provided at the time of the occurrence, either as the employee of the county or, all the more, as the “special *760 employee of the sponsors” envisioned in the dissent,[3] were those of the backdoor guard, to be performed alike whether an arena event had been scheduled or not. These obviously were keyed to security of the county’s arena as a whole rather than the use or abuse of particular items of merchandise brought there temporarily by exhibitors. On such occasions, his function would not be unlike that of a night guard, commonly employed by the owner of a tenanted loft or office building; the existence of such an employee, though he possesses a master key for access to tenants’ premises for the making of “rounds”, would hardly be thought to put the tenant’s merchandise in the “care, custody or control” of the landlord. Nor, for the purposes of summary judgment, did the conclusory depositional testimony of the sponsors’ representative, that she “understood” that more particular guarding was to be provided, suffice to alter this picture (Sutton v East Riv. Sav. Bank, 55 NY2d 550, 553-554).
Finally, on a factually related subject, unlike the dissenters, I find no difficulty with the Appellate Division’s interpretation of the agreement’s provisions for payment for “all expenses for security in relation to the licensee’s performance” as obligating the county to provide security only on January 6, the scheduled day of the show itself, and not on the previous day when the damage occurred. To place the regular guarding not specially employed for the day of the show within the ensuing provision for “usual expenses incurred by the arena” as well as to distinguish it from “expenses for security in relation to the licensee’s performance”, is consistent with the basic construction principle applicable to contracts and statutes (Messina v Lufthansa German Airlines, 47 NY2d 111, 115, mot for rearg den 47 NY2d 1012), that, if possible, all parts of an agreement are to be given meaning (Sanders v Winship, 57 NY2d 391, 396).
The reality then is that the county was making its arena available as a community resource, while looking to licen *761 sees such as the sponsor of the show here to actually put it to use. In this context, the court accorded the words of the agreement their fair and reasonable meaning.
Consequently, the order of the Appellate Division should be affirmed, with costs.

. As the Appellate Division correctly observed, this policy was not the typical “Owners, Landlord’s and Tenants” one, the risk here being defined as “premises and operations” involved in “exhibitions in buildings — trade or educational exhibitions”.

. In attempting to distinguish Greater N. Y. Mut. Ins. Co. v Professional Security Bur. (61 AD2d 975), Rochester Woodcraft Shop v General Acc. Fire & Life Assur. Corp. (35 AD2d 186) and Neville v Continental Cas. Co. (26 AD2d 853) on the ground that their findings of absence of control were based on a physical separation, the dissent loses sight of the fact that, while some separations may be spatial and others functional, the underlying principle is the same (see Dubay v Trans-America Ins. Co., 75 AD2d 312, 318, mot for lv to app den 51 NY2d 709).

. Since this opinion does not turn on whether the backdoor guard was a general employee of the county or an ad hoc one of the sponsors, or on whether the policy procured by the sponsors complied with the licensing agreement, both referred to in the dissent, I have no occasion to treat with either.